WILLIAM D. LITTLE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Little v. Commissioner
Docket No. 1589-90
United States Tax Court
T.C. Memo 1993-281; 1993 Tax Ct. Memo LEXIS 284; 65 T.C.M. (CCH) 3025; June 29, 1993, Filed *284 Decision will be entered under Rule 155. Properties individually held by P were retained for long periods of time, usually serving as rental properties before sale. P sold 321 properties during 1984 to 1986. P had an extensive staff of employees, whose duties often overlapped between P's individual real estate activities and those of his corporation, a real estate dealer. P had a systematic process for buying and selling real estate, maintaining close supervision and control over all phases. In December 1986, P transferred 31 properties to three real estate agents in a sham transaction in order to claim capital gains before the law changed. Held, P was involved in the business of buying and selling real estate, as a dealer, and accordingly any proceeds from the sales of such properties were ordinary income. Held further, P does not have clean hands; he will not be allowed to challenge the form of the sham transaction he created. The sales of the 31 properties were properly reported in 1986 and the proceeds constitute ordinary income. Held further, P is liable for additions to tax for negligence and substantial understatement of tax liability under secs. 6653(a) *285 and 6661, respectively. For petitioner: Kenneth G. Gordon. For respondent: James S. Yan and John Choi. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income tax: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency 6651(a)(1)
6653(a)(1)
6653(a)(2)
1984
$ 781,546  -  $ 39,077 [2]
1985
1,188,469
$ 39,240
[1] 108,003
[3]
1986
2,241,666
-  -
-
Additions to Tax
Sec. Sec. Sec.
Year
6653(a)(1)(A)
6653(a)(1)(B)
6661
1984
- -
$ 195,386
1985
- -
297,117
1986
$ 112,083
[4]
560,416
After concessions, the issues remaining *286 for decision are: (1) Whether petitioner was a dealer in real estate and thus subject to ordinary income treatment on the sales of real property for tax years 1984, 1985 and 1986; we hold he was a dealer. (2) Whether gain in the amount of $ 2,262,450, attributable to 31 properties, was taxable in 1986 or a later year; we hold it is taxable in 1986. (3) Whether petitioner is liable for additions to tax under section 6653(a)(1) [1] for negligent failure to pay tax for the years in issue; we hold he is. (4) Whether petitioner is liable for additions to tax under section 6661 for substantial understatement of tax liability for the years in issue; we hold he is. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, is incorporated herein by this reference. *287 At the time he filed his petition, petitioner resided in Los Angeles, California. Petitioner received a bachelor of arts degree from the University of Toronto, Canada, with a major in anthropology. He did not take any courses in finance. In 1966, petitioner moved to California and bought and sold automobiles until 1972. Was Petitioner a Dealer in Real Estate?
Petitioner began extensively buying and selling real estate in 1972. Properties were primarily purchased at foreclosure sales, usually with a cashier's check. Petitioner subscribed to publications dealing with foreclosure sales of real estate and journals giving notices of trust deed and sheriff sales during the years in issue. From 1984 to 1986, petitioner employed approximately 30 or 40 people in the management of his real properties. Those employees included persons who made certain repairs, as needed, and maintained the properties. As necessary, repairs and maintenance would take place after properties were placed for resale on the market. Petitioner relied on a number of brokers, agents, and escrow companies to execute the sales of his real properties. In addition to his individual holdings, petitioner *288 had proprietary interests in the following real estate joint ventures during the years in issue: (1) Darmiento and Little; (2) Rosner, Billings and Darmiento; (3) Rosner, Kahan, Little; (4) Rosner, Calcote and Little; and (5) Rosner and Darmiento. With the exception of Rosner, Kahan, Little, the other remaining joint ventures did not file Federal income tax returns for the years in issue. Petitioner's individual Federal income tax returns show the following real estate activities: [2]
Total Year
Purchases
Sales
Transactions
1979
25
15
40
1980
35
19
54
1981
59
7
66
1982
44
14
58
1983
55
68
123
1984
41
68
109
1985
54
104
158
1986
68
149
217
As shown in the above chart, petitioner's real estate transactions were continuous and substantial. From 1984 to 1986, petitioner completed 163 purchases and 321 sales of real estate, averaging 161 transactions per year. Proceeds from these sales exceeded $ 17.5 million. The average holding period for properties sold during the years in issue was 58 months. *289 Prior to their sale, the properties involved in the above-mentioned transactions were part of petitioner's substantial rental real estate business. For the taxable years 1984 to 1986, petitioner had rental income from the properties, exclusive of those held in joint venture with Irving Rosner, in the amounts of $ 2,585,338, $ 2,604,703 and $ 2,335,443, respectively. Properties held by the joint venture Rosner and Darmiento, in which petitioner had a one-half interest, had rental income of $ 21,131, $ 19,593 and $ 22,383 in 1984, 1985, and 1986, respectively. Property held by the joint venture, Rosner, Billings and Darmiento, in which petitioner had a one-third interest, had rental income of $ 6,898, $ 3,298, and $ 572 for 1984, 1985, and 1986, respectively. However, after deducting his rental expenses and claiming a depreciation allowance, petitioner claimed significant losses from his rental activities during the years in issue: $ 609,492 in 1984, $ 976,780 in 1985, and $ 1,505,865 in 1986. On December 7, 1982, petitioner organized 2974 Properties Inc. (hereinafter corporation), a wholly owned S corporation. Petitioner organized and operated the corporation for the purpose *290 of acquiring and selling real properties as a dealer. Petitioner would decide whether newly acquired property would be held by the corporation or by him individually. In making this determination, petitioner would evaluate factors as to whether the property qualified for "quick turnaround" or for long-term holding. Real estate purchased for the corporation primarily consisted of properties that were resold very shortly after the acquisition and whose sales were reported as ordinary income on the corporation's tax return. The properties to be held for the long term -- more than 6 months -- were held individually by petitioner. [3]
*291 Petitioner individually retained all property intended to be held for a long term, or greater than 6 months, in order to qualify for the capital gains deduction. Petitioner's individual real estate activities and those of the corporation were, at times, indistinguishable. [4] Petitioner provided the money necessary for the corporation to start its operations. Some of petitioner's personal funds were commingled with the corporation's funds during tax years 1984 to 1986. In addition, the corporation on occasion used petitioner's individual funds to purchase its properties. The corporation also used petitioner's Schedule E employees on occasion to repair, maintain, or make improvements to its properties. During the years in issue, some of the corporation's properties were reported on petitioner's individual tax returns and some of petitioner's individual properties were reported on the corporation's tax return. From 1984 to 1986, the corporation averaged 50 to 75 real estate sales per year and approximately 60 to 75 real estate purchases per year. *292 Frank Darmiento was an employee of petitioner, functioning as petitioner's agent for the years in issue, and also serving as secretary of the corporation. Mr. Darmiento received a percentage of the profit on the sale of the corporation's properties. He and petitioner maintained daily contact regarding the acquisitions of properties. Mr. Darmiento would bid on properties at foreclosure sales on behalf of each of the five joint ventures and for the corporation. In addition to Frank Darmiento, Robert Sanchez and David Darmiento would also attend foreclosure sales on petitioner's behalf. However, Frank Darmiento was the only person who had the discretion to bid on a sale without petitioner's prior approval. The others served as messengers and would only carry out predetermined assignments. Additionally, petitioner had an established agreement with his bank to have a check ready to purchase property for Frank Darmiento upon receiving a call. Mr. Darmiento was not required to sign the checks or the withdrawal slips. Petitioner kept close control over his real estate activities, whether involving purchases and sales or rentals. Even with properties managed by professional management *293 companies, petitioner maintained active involvement through frequent communication over rents, vacancies, and bills. Petitioner paid the insurance and taxes through his own office, personally handled the issuance of permits associated with the rentals, represented himself in eviction actions, and made the determinations as to rent increases and major repairs. In the acquisition of new properties, petitioner had an established and systematic process. He daily read publications and journals which provided notices of trustee's and Internal Revenue Service (IRS) sales, regularly received notices of tax sales from the IRS, and visited the courthouse to inquire into sheriff's sales. During the years in issue, petitioner received approximately 100 notices of sale every day. On the day before a scheduled sale, petitioner would call the trustee to confirm the date and time of the opening bid. He also contacted revenue officers to obtain the value of the property, the amounts of the tax lien, and the percentage of interest being sold in the property. In deciding whether to bid on a piece of property at a foreclosure sale, petitioner considered the following factors: (1) Whether the property *294 would realize at least a $ 20,000 profit; (2) the amount of initial cash required; (3) the area where the property was located; (4) the ease of resale; and (5) the ease of renting. Petitioner regularly served a Three-Day Notice to Quit on the former owners of the acquired property the same day he made the purchase. After receiving the Trustee's Deed and serving the Notice to Quit, petitioner would routinely file an unlawful detainer action to evict the former property owner and obtain possession of the property. For a majority of his rental properties, petitioner signed month-to-month rental agreements with the tenants. A clause in that agreement gave petitioner the right to terminate such agreement upon giving a 30-day notice. Transfer of 31 Properties
On his 1986 income tax return, petitioner claimed a long-term capital gain in the amount of $ 2,262,450 in connection with the sales of 31 properties. On December 30, 1986 (two days before the capital gains deduction was repealed, as discussed below) these 31 properties were transferred to three individuals: William Gaston, Cheryl Johnson, and Ignacio Canales. [5]
*295 The same process was employed in the transfer of each of the 31 properties: (1) Petitioner signed a grant transferring property into the transferee's name; (2) petitioner's equity was calculated, deducting loans and closing costs; (3) the transferee executed back to petitioner a deed of trust for the amount of that equity and a promissory note for the amount in the deed of trust; (4) the transferee also signed quit claim deeds which petitioner held unrecorded to protect his equity in the event something happened to the transferee; and (5) the trust and grant deeds were recorded. The names "David Little" and "Frank Dorman" were used by petitioner as fictitious names in connection with the 31 properties. The reason for the transfer of the 31 properties at the end of 1986 was to take advantage of the capital gains deduction which was being repealed by the Tax Reform Act of 1986, thus making the deduction inapplicable to sales after December 31, 1986. [6]
*296 None of the transferees considered themselves to be the owners of the transferred properties after the transactions took place, and received only commissions for the above transfers. No transfer of funds took place between petitioner and the three transferees. The transferees were real estate agents with whom petitioner regularly did business. All three transferees -- Gaston, Johnson, and Canales -- freely admitted that they entered into the transfers solely to help petitioner escape the consequences of the imminent tax law change. Ms. Johnson stated that she was "in a service profession, and one of the ways of establishing long term relationships with your clients, is to in some way accommodate them, or do them a favor, when possible, and I saw that in this light." Mr. Canales espoused a similar view by stating: "I understood that there was going to be a tax change in 1987, and I, myself, saw it as a one-time opportunity for my client, William Little, to save money on taxes." After the transfers petitioner remained responsible for all expenses or liabilities incurred in connection with these properties. Property or documentary transfer taxes were paid by petitioner. He continued *297 to receive all income derived from the transferred properties. After 1986 the transferees transferred the 31 properties directly to third-party buyers. Petitioner received the proceeds from these transfers. Respondent began to audit petitioner's 1986 Federal income tax return in February 1988. On January 9, 1989, petitioner wrote respondent that any adjustments to 1986 should not include gains from the 31 sales. At the time of this letter, petitioner had still not filed his 1987 return and the 1988 return was not yet due. Petitioner subsequently filed his 1987 and 1988 returns claiming gains from the sales of 30 of the 31 properties. However, petitioner also filed refund claims for the tax paid on these 30 sales for the years 1987 and 1988, primarily for protective purposes should this Court rule against petitioner in the present case. Those years are still open. Mr. John Ko was employed by petitioner in March 1987 as an accountant for petitioner's real estate activities. Mr. Ko testified that, upon his arrival, petitioner's records were chaotic, scattered all over the office, and incomplete. Additionally, petitioner lacked competent employees in the areas of acquisition *298 and sales. Upon his employment, Mr. Ko immediately had to file returns for 2974 Properties, Inc., for tax years 1984 to 1986, and also petitioner's individual returns for tax years 1977 to 1979, which had not yet been prepared. Lacking adequate time to thoroughly prepare petitioner's 1986 Federal income tax return, Mr. Ko attached a disclaimer. The disclaimer, titled "Status of Tax Return Filed", was attached because of Mr. Ko's discomfort with the classifications and amounts reported on the return. The disclaimer stated: This return has been prepared on the basis of available information at this time. While the taxpayer believed that the liability stated hereon is correct, it may be necessary to submit a Form 1040-X within the period of one year to clarify certain items. It is not expected that the liability on said Form 1040-X will be less than shown hereon.
No amended return was filed for 1986. Respondent issued a notice of deficiency on October 25, 1989, for tax years 1984 to 1986. In the notice, respondent treated the transfer of the 31 properties as having occurred in 1986, and disallowed all of petitioner's claimed capital gains deductions for the years in *299 issue. [7]
OPINION Respondent's determination of deficiencies for the years in issue is presumed correct, and petitioner bears the burden of proving respondent erred. Rule 142(a); . Long-Term Capital Gain Deductions
Respondent contends that petitioner was a real estate dealer during the years in issue, and thus, all the profits from the sales of real property were ordinary income, regardless of the holding period. Conversely, petitioner argues that he is entitled to capital *300 gain treatment on the sales of his properties because his primary purpose was not to hold the properties for sale but for rental and for appreciation in value. Section 1222(3) defines a long-term capital gain as the "gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income." Under section 1202, if a taxpayer has a net capital gain for the taxable year, 60 percent of that net capital gain will be deducted from gross income. A "capital asset" is defined in exclusionary terms in section 1221 as not including: (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
"Primarily" means "of first importance" or "principally". . We have held that it is a question of fact as to whether the income in issue arose (1) from the sale of property held primarily for sale to customers in the *301 ordinary course of the taxpayer's trade or business or (2) from the sale of property held primarily for another purpose. ; . In making this determination, we must consider (1) whether petitioner held the property primarily for sale to customers and (2) whether the property was for sale in the ordinary course of petitioner's trade or business. See (citing . In many cases, the parties' dispute focuses on whether the taxpayer was in a trade or business. However, it is clear from the record in the present case that petitioner was involved in a trade or business and that he held the properties in issue in that trade or business. Petitioner was continuously and regularly involved in real estate activities with the primary purpose of earning income or profit. See . It is well *302 established that a taxpayer may be engaged in more than one trade or business, see , and that a taxpayer in the real estate business may hold real estate as an investment. . Therefore, in the instant case, the dispute centers on whether petitioner's primary purpose was to hold the property for sale to customers in the ordinary course of his trade or business or whether his primary purpose was to the hold the property for sale to customers in the ordinary course of his trade or business or whether his primary purpose was to the hold the property for some other business reason, e.g. rental. The taxpayer's primary purpose for holding property at a particular time is subject to change. Therefore, in determining the taxpayer's purpose for tax treatment, the focus is on the time of the sale. ; . However, we may consider events over the course of the ownership *303 to determine the primary holding purpose at the time of the sale. . To decide whether particular property is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business, courts have considered the following factors: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.
, quoting ; see also , *304 affg. . Since no single factor is dispositive, each case must be decided on its facts and circumstances. ; . In Biedenharn, the Fifth Circuit stated that the most important of the above factors is the frequency and substantiality of the taxpayer's sales, although it is not conclusive. The court noted that when dispositions of property extend over a long period of time and are especially numerous, the likelihood of capital gain is very slight. . Conversely, the taxpayer's claim for capital gain treatment is afforded greater credence when the sales are few and isolated. Id. In , the Court of Appeals for the Fifth Circuit held that a taxpayer who engages in frequent and substantial sales is almost inevitably engaged in the real estate business. "The frequency and substantiality *305 of sales are highly probative on the issue of holding purpose", stated the court, "because the presence of frequent sales ordinarily belies the contention that property is being held 'for investment' rather than 'for sale.'" Id.
In most cases addressing this issue, the courts have noted that the methods used by the taxpayer in achieving the sales of property -- such as advertising, use of brokers or agents, or substantial personal efforts -- are relevant and significant factors. See This reasoning seems to evolve from the premise that aggressive and active efforts to sell are indicative of a business, but not of sales of property held for investment. Although using a broker does not automatically signify a business, continued involvement by the taxpayer in the sales, such as setting the selling prices and credit terms, favors a conclusion of business rather than investment activity. See generally In the case at hand, petitioner used numerous real estate agents in the sales of his properties but always maintained input *306 on the prices and terms. During the years in question, petitioner's real estate activities were regular and continuous. It is clear that petitioner engaged in a sufficient quantity of activity to be considered in the business of buying and selling real estate. Petitioner hired full time bookkeepers and computer data processors to help manage his extensive real estate purchases and sales. From 1984 to 1986, petitioner completed real estate transactions amounting to 163 purchases and 321 sales of properties, an average of 161 transactions per year. Proceeds from these sales exceeded $ 17.5 million. In Suburban Realty, where the court found that the taxpayer was in the real estate business, the taxpayer completed 244 sales over 33 years with sales proceeds exceeding $ 2.3 million. . We agree with the court in Suburban Realty that frequent and substantial sales belie petitioner's contention that the properties were being held as investments. Here, petitioner clearly executed continuous and substantial purchases and sales of properties in both quantity and value. In his own testimony, *307 petitioner stated that he made the decision to sell his own properties, which was corroborated by the testimony of various real estate agents. He maintained a personal role with properties that were being managed by a management company, including discussing with management personnel the rent levels, vacancies, and delinquent rentals. He completed the necessary paperwork and attended court to evict prior owners after he acquired the property. Petitioner also established a clear and well-defined division of labor among his employees. Finally, petitioner maintained the office for his real estate activities in his own home for convenience and to maintain complete control. Although he dealt with numerous independent real estate agents and escrow companies, petitioner exercised close and direct supervision and control over all his representatives involved in the sales of his properties. Petitioner contends that capital gain treatment should be permitted when the property has been held for a substantial period of time. Petitioner relies on , in asserting that holding an asset for many years indicates *308 an intention to hold for investment rather than for sale, since a long period of holding assets violates the concept of an organized business. Id.; see also . However, a lengthy holding period is not dispositive in reconciling the investment versus business issue and, in fact, has not prevented property from being excluded from capital asset status. See ; , affg. in part and revg. in part . For example, the Court of Appeals for the Fifth Circuit held, in , that not all gains from appreciation over a substantial period of time will be treated as capital gains. With respect to sales of real estate, the court stated that when the "ordinary business of a business is to make profits from appreciation in value caused by market forces, those profits are to be treated as ordinary income." *309 Id.
Petitioner consistently argues that his primary purpose for holding real estate was for rental and for appreciation in value, both of which, he claims, are investment rather than sale related. Although rental property can be held as an investment, a taxpayer can also be involved in the rental real estate business. In fact, when discussing the rental holding purpose, petitioner refers to his rental activities as his "rental business". To validate his claim of operating a "rental business", petitioner refers to the time he devotes to daily decisions involving rent levels, supervising repairs, obtaining permits, and setting policy guidelines. However, if petitioner operates a rental business, the rental properties are assets used in that business and are, therefore, not investment property held individually by petitioner. Sec. 1221(2). We are cognizant that property used in a trade or business can be entitled to long-term capital gains treatment under section 1231. However, as discussed below, we find that, regardless of the fact that he initially received rental income, petitioner held the properties in issue primarily for sale in the ordinary course of his business which *310 excludes the property from the purview of section 1231. [8]
In addition, petitioner argues that he created and operated 2974 Properties, Inc., to be in the business of buying and selling property or to act as a real estate dealer, and therefore he, individually, is an investor and not a dealer. This argument is irrelevant to our determination. Petitioner's operation of the corporation as a dealer does not automatically relieve him of being a real estate dealer in an individual capacity. Finally, petitioner claims that he would have not made the same type of repairs on the properties after their purchase if he was interested in a quick turnaround. The repairs, petitioner contends, were meant to enhance the properties' rentability, *311 not saleability. In addition, petitioner enumerates the amount of time and effort devoted to his rental operations as well as the complexity and extensiveness of those operations, which generate substantial amounts of income. We are not convinced by petitioner's arguments that the properties in issue were held primarily for rental purposes. As previously mentioned, the proceeds from petitioner's sales during the years in issue exceeded $ 17.5 million. In contrast, the gross rental receipts received by petitioner during the years in issue only slightly exceeded $ 7.5 million. Although we do not deny that petitioner's gross rental receipts are significant, proceeds from sales were 2.3 times larger. Moreover, after deducting expenses and depreciation, the rental business produced net losses. We find the large difference between sales proceeds and rental receipts to be significant in determining petitioner's "primary" holding purpose. Even if we entertained petitioner's contentions that his purpose at the time of buying and holding these properties was rental, we nevertheless would conclude that, at the time of sale, petitioner held these properties primarily for sale to customers. *312 Petitioner's purpose at the time of sale is dispositive in determining tax treatment. . In conclusion, we find that petitioner engaged in the business of buying and selling real estate, held the property primarily for sale to customers, and the sales of property occurred in the ordinary course of petitioner's business. Accordingly, proceeds from the sales of properties in issue are ordinary income. Gain on 31 Properties Reported in 1986
On his 1986 Federal income tax return, petitioner reported capital gains on the sale of 31 properties, claiming a long-term capital gain in the amount of $ 2,262,450. Faced with the prospect that gain on these sales may be taxed as ordinary income, petitioner now argues that the 31 sales should be disregarded because they were not bona fide and were made in contemplation of the change in the tax law eliminating the capital gains deduction under the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085. In other words, he now seeks relief from the sham he deliberately perpetrated in order to avoid tax. [9]
*313 After respondent began auditing petitioner's 1986 individual return, petitioner reported the gains from the sales of 27 properties in 1987 and 3 properties in 1988, retaining title in one of the properties. Petitioner explains that the sham transactions were executed pursuant to his prior accountant's advice in a hurried telephone conversation at the end of the tax year. Petitioner states he clearly intended to retain ownership and control, as evidenced by the fact that all benefits and burdens remained with him until the post 1986 sales of the properties to independent third parties. Petitioner requests this Court to disregard the form and look to the substance of the transactions. Petitioner introduced the testimony of the three real estate agents to whom the 31 properties were transferred to support his argument that the sales were in fact shams. Each of those agents testified that they did not consider themselves to be the true owners of the properties transferred to them and that the burdens and benefits associated with those properties continued to accrue to petitioner. After stating that they realized they were not truly receiving ownership of the transferred properties, *314 the three agents were cavalier in admitting that they participated in the transactions to accommodate petitioner, to allow him to receive a tax benefit he would otherwise lose, and to build a long-term client relationship. We have previously stated that a taxpayer may have "less freedom" than respondent "to ignore the transactional form that he has adopted." (quoting . In addressing substance over form arguments raised by the taxpayer, the standard applied by this Court is the "strong proof" rule. It requires the taxpayer to present "strong proof", that is, more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties. ; (citing , affg. . *315 However, taxpayers are entitled to attack the form of their transaction only when their tax reporting and other actions have shown an honest and consistent respect for what they argue is the substance of the transaction. , affd. (citing . In , we found that several factors supported our conclusion that the taxpayers should not be allowed to disavow their chosen form. First, the taxpayers sought to disavow their own tax return treatment for the transaction. Second, their tax reporting and actions did not show an honest and consistent respect for the substance of the transaction. Finally, the taxpayers unilaterally attempted to have the transaction treated differently after it had been challenged. Id. We stated that to allow the taxpayers to disavow their chosen form, under such circumstances, would at a minimum be an "untoward invitation" *316 to the kind of concealment that the taxpayers attempted in that case. . Similarly, in the case at hand, petitioner seeks to disavow his own tax treatment of the transaction, failing to show an honest and consistent respect for the transaction's substance. He did this only after an audit began. To allow him to disavow his chosen form would invite similar intentional deceit on the part of other taxpayers seeking to gain a tax benefit. This Court has traditionally not had equity jurisdiction. . However, we may apply general equitable principles in deciding matters over which we otherwise have jurisdiction. . [10]
*317 The equitable principle of "quasi estoppel" or "the duty of consistency" applies in this Court. , affg. . The "duty of consistency" is based on the theory that the taxpayer owes respondent the duty to be consistent with his tax treatment of items and will not be permitted to benefit from his own prior error or omission. . In cases where the taxpayer has clearly, from the evidence presented, attempted to deceive the Government by the form of the transaction he has chosen, the taxpayer should not be allowed to present proof of the underlying substance of the transaction in issue. In other words, when raising a substance over form argument, the taxpayer must have "clean hands" before he is allowed to present strong proof that the form chosen does not reflect the true substance of the transaction. See, e.g., ; *318 ; see also ; . Here, petitioner appears in this Court with dirty hands. Moreover, he failed his "duty of consistency" owed to respondent in regard to these transactions, in that he reported them inconsistently with his present claim. Accordingly, we find that the sales of the 31 properties were properly reported in 1986. Because we previously determined that petitioner was a dealer in real estate, the gains are ordinary income. Addition to Tax - Negligence
In her notice of deficiency, respondent determined that petitioner is liable for an addition to tax under section 6653(a)(1) and (2) for the years 1984, 1985, and 1986. Section 6653(a)(1) provides that if any part of the underpayment is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the entire underpayment. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest *319 payable under section 6601 with the respect to the portion of the underpayment due to negligence or intentional disregard. An "underpayment" for purpose of section 6653 is a "deficiency" as defined in section 6211. Sec. 6653(c)(1). Section 6211(a) defines the deficiency as the amount by which the tax liability exceeds the tax shown on a timely filed return. Negligence under section 6653(a) is a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." (quoting , affg. in part and remanding in part . Taxpayers have a statutory duty to timely file Federal income tax returns. Sec. 6072(a). Ordinarily, a reasonable and prudent person would comply with the prescribed deadline, and the breach of this duty is evidence of negligence. , affd. . Petitioner bears the burden of proof *320 regarding the additions to tax under section 6653(a). Rule 142(a); . As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer. ; . However, good faith reliance on the advice of counsel or a qualified accountant can, under certain circumstances, be a defense to the addition to tax for negligence. . In the case at hand, petitioner relies on several decisions issued by this Court in which we refused to impose the addition to tax for negligence where the issues involved in the cases were relatively complex and could yield an honest difference of opinion. See ; ; . However, *321 petitioner has failed to convince us that the issue in this case is complex or subject to an honest difference of opinion. We find that sufficient evidence exists in this case to conclude that petitioner was negligent. In , we held that a real estate dealer, who claimed capital gain deductions for profits from real estate sales on his tax returns, was liable for an addition to tax for negligence. We disallowed his claim to those deductions due to the fact that he had been in the real estate business for many years and obtained a majority of his income from real estate sales. The taxpayer in Norris, like petitioner in the present case, argued that his intent in acquiring the properties was to generate rental income, as evidenced by the renovations and improvements made to the acquired property. However, we found that, despite the fact that some of the improved property sold by the taxpayer during the years in issue generated rent, the vast majority of the taxpayer's acquisitions were unimproved land and the record failed to indicate such properties ever generated any rental income. Id.
In the case *322 at hand, petitioner attempts to distinguish Norris by stating that he, unlike the taxpayer in Norris, maintained distinctions between the properties held by the corporation for sale and the properties he held individually for rental purposes. However, we find his statements to be self-serving and lacking credibility. Petitioner, like the taxpayer in Norris, has been in the real estate business for over 21 years and a majority of his income has been from his real estate sales. Therefore, Norris is applicable to the case at hand. Moreover, petitioner has already admitted that he failed to timely file his 1985 Federal income tax return. Petitioner's accountant, Mr. Ko, testified that petitioner's records were chaotic, scattered all over the office, and lacked completeness. In addition, at the time Mr. Ko's services were employed in March 1987, petitioner lacked competent employees in the area of acquisition and sales. Furthermore, upon Mr. Ko's arrival, he immediately had to file returns for 2974 Properties for tax years 1984 to 1986 and then petitioner's individual returns for tax years 1977 to 1979, which had not yet been prepared. Based on the above evidence, *323 we conclude that petitioner failed to exercise due care under the circumstances and, therefore, was negligent. Accordingly, we find that petitioner is liable for the addition to tax for negligence. Addition to Tax - Substantial Understatement
Respondent determined that petitioner is liable for additions to tax under section 6661 for substantial understatement of income tax liability for 1984, 1985, and 1986. Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. An understatement is substantial if it exceeds the greater of: (1) 10 percent of the tax required to be shown on the return for a taxable year, or (2) $ 5,000. Sec. 6661(b)(1)(A). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2); . The amount of the understatement can be reduced if substantial authority exists or existed for petitioner's tax treatment of the item in dispute or if relevant facts regarding *324 petitioner's treatment of the item were adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioner contends that substantial authority existed for his tax treatment of the property transactions in issue. However, we have previously found that his claim of capital gains deductions on the sales in issue was unreasonable due to the fact that he had been in the real estate business for many years and obtained a majority of his income from real estate sales. Therefore, he has failed to satisfy the standard of proof required by this section. Additionally, petitioner claims that he adequately disclosed the tax treatment of the items in issue by attaching a statement to the return. Although petitioner attached a statement of disclaimer to his 1986 return, the statement did not reasonably apprise respondent of the identity, amount, and nature of the potential controversy over the gain attributable to sales of 31 properties. It simply stated that an amended return might be warranted. Furthermore, petitioner failed to introduce any evidence that adequate disclosure was made for the remaining years in issue. Accordingly, petitioner failed *325 to prove adequate disclosure was made. We find petitioner is liable for the addition to tax under section 6661. Conclusion
We find that petitioner was a dealer in real estate, that he held the property primarily for sale to customers in the ordinary course of his real estate business, and, therefore, any proceeds from the sales of his properties will be classified as ordinary income. In addition, we conclude that the gain from the sale of the above-mentioned 31 properties was properly reported in tax year 1986. Moreover, pursuant to our prior determination, such gain will be taxed as ordinary income. Furthermore, we find petitioner liable for additions to tax for negligence and for substantial understatement of his income tax liability under sections 6653(a) and 6661, respectively. To reflect the foregoing and some concessions, Decision will be entered under Rule 155.
Footnotes
2. 50 percent of the interest due on $ 781,546.↩
1. This amount, as determined by respondent, does not equal 5 percent of the deficiency pursuant to section 6653(a)(1). This calculation should be corrected under Rule 155.↩
3. 50 percent of the interest due on $ 1,188,469.↩
4. 50 percent of the interest due on $ 2,241,666.↩
1. All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Petitioner also held other real estate in an S corporation discussed below. Activities as reported by the corporation are not challenged by respondent.↩
3. During the years in issue, a 60 percent capital gains deduction was available on gain on the sale or exchange of a capital asset held for more than 6 months. Sec. 1222(3). A "net long-term capital gain" was defined as the excess of long-term capital gains over long-term capital losses. Sec. 1222(7). This 60 percent deduction was repealed by the Tax Reform Act of 1986. See infra↩ note 6.
4. The question of whether the corporation is actually the "alter ego" of petitioner is not at issue in this case. Nonetheless, the relationship between petitioner's corporate and individual real estate activities is relevant to the issues at hand for respondent contends that petitioner was also a "dealer" with regard to the long-term properties.↩
5. Petitioner transferred 4 properties to William Gaston, 23 properties to Cheryl Johnson, and 4 properties to Ignacio Canales.↩
6. Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2216. See supra↩ note 3 for further explanation.
7. The parties have made some mutual concessions. Petitioner admits that he failed to timely file his 1985 Federal income tax return and is, therefore, liable for the addition to tax under sec. 6651(a)(1). Respondent concedes that petitioner overstated gain on the sale of 12 pieces of property during the years in issue. Additionally, respondent concedes that petitioner is entitled to a deduction in the amount of $ 290,906 for the satisfaction of a judgment in 1985.↩
8. Property used in a trade or business and subject to depreciation is given long-term capital gains treatment under sec. 1231. However, sec. 1231(b)(1)(B) excludes "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."↩
9. This reminds one of the definition of "chutzpah": The young man who, on trial for murdering his parents, throws himself on the mercy of the court on the grounds he is an orphan.↩
10. The Court may not "exercise" general equitable principles to take jurisdiction over a matter not provided for by statute. ; see also . Here, we clearly have jurisdiction to decide whether petitioner is bound by the form of the transaction he adopted.↩